## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JANICE MCMONIGLE; AMBERLY OGDEN; MOLLY SLIWINSKI; and LAUREN WELLS,<br><br>    Plaintiffs,<br><br>v.<br><br>11578243 CANADA, INC. d/b/a BLACKOXYGEN ORGANICS; BLACKOXYGEN ORGANICS USA, INC.; MARC SAINT-ONGE; and CARLO GARIBALDI,<br><br>    Defendants. | CIVIL ACTION NO: |

## <u>CLASS ACTION COMPLAINT</u>

1.      This case involves the marketing and sale of BlackOxygen brand nutritional supplements.  The supplements were specifically marketed for use by adults, children, and pregnant or nursing women.  Although most organic products contain trace amounts of heavy metals, the products at issue contain unsafe levels of toxic heavy metals that render them unsafe and unfit for their intended use.  Plaintiffs and each proposed class member are purchasers of the products.

I.    PARTIES

2.    Janice McMonigle ("McMonigle") is a confirmed purchaser of Defendants' products.  McMonigle is a citizen and resident of Georgia.  By bringing this action, Plaintiff avails herself of the jurisdiction of this Court.

3.    Amberly Ogden ("Ogden") is a confirmed purchaser of Defendants' products.  Ogden is a citizen and resident of Georgia.  By bringing this action, Plaintiff avails herself of the jurisdiction of this Court.

4.    Molly Sliwinski ("Sliwinski") is a confirmed purchaser of Defendants' products.  Sliwinski is a citizen and resident of Georgia.  By bringing this action, Plaintiff avails herself of the jurisdiction of this Court.

5.    Lauren Wells ("Wells") is a confirmed purchaser of Defendants' products.  Wells is a citizen and resident of Georgia.  By bringing this action, Plaintiff avails herself of the jurisdiction of this Court.

6.    11578243 Canada, Inc. d/b/a BlackOxygen Organics ("11578243 Canada") is a Canadian corporation with its principal place of business in Ontario, Canada.  At all times relevant to this Complaint, 11578243 Canada was a direct sales, multi-level marketing company that manufactured, distributed, marketed, and sold the products at issue in this action. 11578243 Canada will be served via the Hague Convention at 6200 Boulevard Taschereau, Suite 405, Broussard, Que, J4W3J2.

2

7.     BlackOxygen Organics, USA, Inc. ("BlackOxygen Organics, USA") is a Wyoming corporation with its principal place of business in Sheridan, Wyoming.  At all times relevant to this Complaint, BlackOxygen Organics, USA was a wholly owned affiliate of 11578243 Canada.  At all times relevant to this Complaint, BalckOxygen Organics USA was a direct sales, multi-level marketing company that manufactured, distributed, marketed, and sold the products at issue in this action.  BlackOxygen Organics, USA will be served through its registered agent, Northwest Registered Agent Service, Inc., located at 30 N Gould Street STE N, Sheridan, Wyoming 82801 USA.

8.     Marc Saint-Onge ("Saint-Onge") is a citizen and resident of Ontario, Canada.  Saint-Onge is the founder, owner, and Chief Executive Officer of 11578243 Canada, Inc. and BlackOxygen Organics, USA, Inc.  Saint-Onge is also the formulator of the company's nutritional products.  Saint-Onge will be served with process via the Hague Convention at 3-80 Prestige Circle, Orleans, Ontario, Canada K4A0Y1 or anywhere else he may be found.

9.     Carlo Garibaldi ("Garibaldi") is a citizen and resident of Ontario, Canada.  Garibaldi is the President of 11578243 Canada, Inc. and BlackOxygen Organics, USA, Inc.  Garibaldi will be served with process via

3

the Hague Convention at 25 Pace Crescent, Bradford, Ontario L3z3h8, or wherever else he may be found.

10.     Except where otherwise noted, 11578243 Canada, BlackOxygen Organics, USA, Saint-Onge, and Garibaldi are collectively referred to as "BlackOxygen."

11.     Each BlackOxygen Defendant is subject to the jurisdiction of this Court for the following reasons:

11.1   A nonresident defendant is subject to personal jurisdiction under the Georgia long-arm statute by virtue of doing business in Georgia, by contracting with Georgia residents pursuant to contracts to be performed in part in Georgia, and/or by committing torts where one or more elements of the tort occurred in Georgia.  Defendants have engaged in such acts in Georgia.

11.2   Defendants knowingly, intentionally, and deliberately placed its products into the stream of commerce under circumstances such that Defendants should reasonably anticipate being haled into court in Georgia to answer claims about the sale of their products in Georgia.

11.3   Defendants regularly do business in Georgia, solicit business in Georgia, derive substantial revenue from goods or services in Georgia, derive substantial revenue from Georgia residents via

internet sales, have agents or representatives or officers or employees in Georgia, maintain an office in Georgia, and have subsidiaries or business affiliates in Georgia.

11.4   Defendants place their products into the stream of commerce by targeting Georgia consumers through approved distributors in the State.

11.5   Defendants solicits and contracts with brand partners in Georgia to facilitate the sale of its products.

11.6   Defendants have a regular plan for the distribution of their products in Georgia with the goal of achieving a commercial benefit from the sale of products in Georgia.

11.7   Defendants engage in national marketing of their products that intentionally pervade into the Georgia market.

11.8   Defendants target marketing specific to Georgia.

11.9   Defendants have contractual agreements with Georgia companies to use its trademarks in Georgia.

11.10 Defendants have purposefully availed themselves of the privilege and benefits of conducting business in Georgia.

11.11 Defendants' negligent acts both inside and outside Georgia caused injury within Georgia.

11.12 The claims in this action are connected with and/or relate to

Defendants' extensive contacts with Georgia.

11.13 Georgia has an interest in adjudicating this dispute which

occurred, at least in part, in Georgia, and which involved actions that

caused harm to Georgia residents.

11.14 Allowing Defendants to escape jurisdiction would improperly

allow Defendants to wield the Due Process Clause as a territorial

shield to avoid interstate obligations that Defendants have voluntarily

assumed.

12.     This Court additionally has subject matter jurisdiction over this case

pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship

between the parties, and as the amount in controversy exceeds the

jurisdictional thresholds.

13.     Venue is proper in this Court as to Defendant BlackOxygen Organics,

USA, Inc. pursuant to 28 U.S.C. § 1391(d) because is it subject to personal

jurisdiction in this district.  Venue is proper in this Court as to all other

Defendants pursuant to 28 U.S.C. § 1391(c)(3) because they are all non-

residents of the United States.

II.    FACTS

14.    BlackOxygen extracts mud from a bog that it claims is rich in fulvic acid.

15.    BlackOxygen then dries the mud, processes it, and sells the resulting product in powder and pill form.

16.    The specific products at issue in this action are BlackOxygen Tablets and BlackOxygen Powders:





17.    BlackOxygen markets the subject products for consumption orally and/or absorption into the skin through baths, balms, masks, and douching.

18.     Fulvic acid itself may have health and wellness benefits, but the benefits of fulvic acid are not at issue in this action.  Instead, the issue is the actual content of the subject products.

19.     BlackOxygen claims that the subject products have magical healing properties for a variety of ailments.

20.     The subject products do not have magical healing properties.

21.     BlackOxygen claims that the subject products contain "miracle molecules" that promote general wellness.

22.     The subject products do not promote general wellness.

23.     BlackOxygen claims that the subject products increase athletic performance.

24.     The subject products do not increase athletic performance.

25.     The subject products were specifically marketed for use by adults, children, and pregnant or nursing women.

26.     The subject products offer no medical benefits to humans.  Worse, the subject products are dangerous for human use and consumption.

27.     Upon information and belief, all BlackOxygen products are derived from mud taken from the same point source.

28.     Upon information and belief, all BlackOxygen mud originates from Moose Creek Bog in Ontario, Canada.

8

29.     As sold to consumers, the subject products contain dangerously high levels of toxic heavy metals.

30.     BlackOxygen knows that its customers trust the quality of its products, and that its customers expect BlackOxygen products to have safe levels of heavy metals, if they are present at all.

31.     BlackOxygen affirmatively holds the subject products out as possessing high quality organic ingredients free of harmful toxins, contaminants, or chemicals.

32.     No reasonable consumer seeing BlackOxygen's marketing would expect the subject products to contain unsafe levels of toxic heavy metals. Furthermore, reasonable consumers, like Plaintiffs, would consider the mere inclusion of unsafe levels of toxic heavy metals a material fact when considering whether to purchase the subject products.

33.     As a matter of state and federal law, the presence of unsafe levels of toxic heavy metals makes the subject products adulterated, unlawful, and worthless.

34.     Plaintiffs and the class members were thus harmed by purchasing and/or consuming the subject products, and Plaintiffs and the class members are entitled to recover damages from Defendants.

III.    CLASS ACTION ALLEGATIONS

35.    Plaintiffs bring this action as a class action pursuant to O.C.G.A. § 9-11-23 and/or Fed. R. Civ. P. 23, individually, and on behalf of the following classes:

    1.    All residents of Georgia with a confirmed purchase of BlackOxygen Tablets and/or BlackOxygen Powders products from November 19, 2019, through present.

    2.    All residents of the United States with a confirmed purchase of BlackOxygen Tablets and/or BlackOxygen Powders products from November 19, 2019, through present.

36.    Excluded from the class are Defendants, as well as Defendants' employees, officers, and directors, and the Judge presiding over this case. Plaintiffs reserve the right to amend the definition of the class if discovery and/or further investigation reveals that the class definition should be expanded or otherwise modified.

37.    **Numerosity / Impracticality of Joinder**:  The members of the class are so numerous that joinder of all members would be impractical.  The members of the class are easily and readily identifiable from information and records in the possession, control, or custody of third parties.  Plaintiffs do not know the number of persons in Georgia or the United States who

10

purchased Defendants' products, but reasonably believes that there are more than one hundred persons in each of the proposed classes.

38.   **Commonality and Predominance**:  There is a well-defined community of interest and common questions of law and fact that predominate over any questions affecting the individual members of the class.  These common legal and factual questions, which exist without regard to the individual circumstances of any class member, include, but are not limited to, the following:

> 1)   Whether Defendant negligently, recklessly, and/or intentionally sold adulterated products; and
>
> 2)   Whether Defendant negligently, recklessly, and/or intentionally marketed adulterated products.

39.   **Typicality**:  Plaintiffs' claims are typical of the class claims in that Plaintiffs and the class members all purchased Defendants' adulterated products.  As such, Plaintiffs' claims arise from the same practices and course of conduct that gives rise to the class claims, and Plaintiffs' claims are based upon the same legal theories as the class claims.

40.   **Adequacy**:  Plaintiffs will fully and adequately protect the interests of the members of the class and have retained class counsel who are experienced and qualified in prosecuting class actions, including consumer

class actions and other forms of complex litigation.  Neither the Plaintiffs nor Plaintiffs' counsel have interests which are contrary to, or conflicting with, those interests of the class.

41.   **Superiority**:  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because it is economically impracticable for members of the class to prosecute individual actions; prosecution as a class action will eliminate the possibility of repetitious and redundant litigation; and a class action will enable claims to be handled in an orderly and expeditious manner.

### COUNT 1: NEGLIGENCE

42.   Defendants owed Plaintiffs and the class members a duty of ordinary care to ensure that Defendants' products were not adulterated, to source raw material that is free from unsafe levels of toxic heavy metals, and to maintain its production facilities in manner that prevents adulterated products from being sold.

43.   Defendants breached these duties by selling products that were adulterated, and by failing to maintain its production facilities in a manner that would have prevented its products from becoming adulterated.

44.   As a result of Defendants' negligence, Plaintiffs and the class members purchased products that were completely without value,

deleterious to human health, and Plaintiffs and the class members suffered economic harm.

45.    As a result of Defendants' negligence, Plaintiffs and the class members also consumed and/or exposed themselves to poisonous, adulterated products and thereby suffered physical harm.

46.    Accordingly, Plaintiffs are entitled to collect from Defendants an amount to be determined by the enlightened conscience of an impartial jury.

## COUNT 2: NEGLIGENCE PER SE –
## ADULTERATED FOOD AND/OR COSMETICS

47.    The Georgia Food Act states that "[a] food shall be deemed to be adulterated if: It bears or contains any poisonous or deleterious substance which may render it injurious to health…."  O.C.G.A. § 26-2-26.

48.    Under the Georgia Food Act, "[t]he manufacture, sale or delivery, holding, storage, or offering for sale of any food that is adulterated or misbranded" is strictly unlawful.  O.C.G.A. § 26-2-22.

49.    Under the federal Food Drug and Cosmetic Act, a food is deemed to be adulterated "[i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health."  21 U.S.C. § 342.

50.    Under the federal Food Drug and Cosmetic Act, "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded" is strictly

unlawful.  21 U.S.C. § 331.

51.     By including unsafe levels of toxic heavy metals in their products, Defendants violated the Georgia Food Act and the federal Food Drug and Cosmetic Act.

52.     Plaintiffs and the class members fall within the class of persons intended to be protected by the Georgia Food Act and the federal Food Drug and Cosmetic Act.

53.     As a result of Defendants' negligence, Plaintiffs and the class members purchased products that were completely without value, and Plaintiffs and the class members suffered economic harm that the Georgia Food Act and the federal Food Drug and Cosmetic Act were intended to prevent.

54.     As a result of Defendants' negligence, Plaintiffs and the class members also consumed and/or exposed themselves to poisonous, adulterated products and thereby suffered physical harm that the Georgia Food Act and the federal Food Drug and Cosmetic Act were intended to prevent.

55.     Accordingly, Plaintiffs are entitled to collect from Defendants an amount to be determined by the enlightened conscience of an impartial jury.

## COUNT 3: NEGLIGENT MISREPRESENTATION / OMISSION

56.    Defendants owed Plaintiffs and the class members a duty to not include false statements in its marketing, and a duty to disclose any unsafe levels of toxic or harmful ingredients that are contained in its products.

57.    BlackOxygen claims through its marketing material and product labeling that the subject products are safe for human consumption, were specifically tested for unsafe levels of toxic heavy metals, and do not contain unsafe levels of toxic heavy metals.

58.    BlackOxygen's marketing does not disclose that the products contain unsafe levels of toxic heavy metals such as arsenic, lead, and cadmium.

59.    These statements and omissions are false and materially misleading as Defendants' products contain unsafe levels of toxic heavy metals that render their products dangerous and unfit for human use.

60.    Based on Defendants' internal testing and documentation, Defendants knew or should have known that its products contained unsafe levels of toxic heavy metals.

61.    Plaintiffs and the class members reasonably relied on the above-refenced representations and omissions contained in Defendants' marketing by purchasing, consuming, and exposing themselves to Defendants' products.

62.     But for the above-referenced representations and omissions contained in Defendants' marketing, Plaintiffs and the class members would not have purchased, consumed, or exposed themselves to Defendants' products.

63.     As a result of Defendants' negligence, Plaintiffs and the class members purchased products that were completely without value, and Plaintiffs and the class members suffered economic harm.

64.     As a result of Defendants' negligence, Plaintiffs and the class members also consumed and/or exposed themselves to poisonous, adulterated products and thereby suffered physical harm.

65.     Accordingly, Plaintiffs are entitled to collect from Defendants an amount to be determined by the enlightened conscience of an impartial jury.

**COUNT 4: FRAUDULENT MISREPRESENTATION / OMISSION**

66.     Defendants owed Plaintiffs and the class members a duty to not include false statements in its marketing, and a duty to disclose any unsafe levels of toxic or harmful ingredients that are contained in its products.

67.     BlackOxygen claims, through its marketing material and product labeling, that the subject products are safe for human consumption, were specifically tested for unsafe levels of toxic heavy metals, and do not contain unsafe levels of toxic heavy metals.

68.     BlackOxygen's marketing does not disclose that the products contain

unsafe levels of toxic heavy metals.

69.     These statements and omissions are false and materially misleading as Defendants' products contain unsafe levels of toxic heavy metals that render their products dangerous and unfit for human use.

70.     When Defendants made the above-referenced representations and omissions, Defendants knew that its products contained unsafe levels of toxic heavy metals.

71.     Defendants made the above-referenced representations and omissions with the express intent of inducing Plaintiffs and the class members to purchase Defendants' products.

72.     Plaintiffs and the class members reasonably relied on the above-referenced representations and omissions contained in Defendants' marketing by purchasing, consuming, and exposing themselves to Defendants' products.

73.     But for the above-referenced representations and omissions contained in Defendants' marketing, Plaintiffs and the class members would not have purchased, consumed, or exposed themselves to Defendants' products.

74.     As a result of Defendants' fraudulent acts and omissions, Plaintiffs and the class members purchased products that were completely without value, and Plaintiffs and the class members suffered economic harm.

75.   As a result of Defendants' fraudulent acts and omissions, Plaintiffs and the class members also consumed and/or exposed themselves to poisonous, adulterated products and thereby suffered physical harm.

76.   Accordingly, Plaintiffs are entitled to collect from Defendant an amount to be determined by the enlightened conscience of an impartial jury.

## COUNT 5: PRODUCT LIABILITY

77.   Customer safety should be a top priority for Defendants.

78.   Defendants manufactured, prepared, blended, and otherwise created the adulterated products purchased by Plaintiffs and the class members.

79.   Defendants' adulterated products were defectively designed and manufactured by Defendants because, during the normal and foreseeable use by Plaintiffs and the class members, the adulterated products were hazardous and unfit for human health.

80.   Defendants' products were defectively designed because the risks of the chosen design outweighed the utility of the chosen design, particularly in light of alternative and feasible safer designs available, which were known or should have been known to Defendants.

81.   Defendants' products were defective, not merchantable, and not reasonably suited for its intended use at the time they left Defendants' control.

82.    Defendants' products were expected to reach Plaintiffs and the class members without substantial change in the condition in which they were created.

83.    Defendants' products did reach Plaintiffs and the class members without substantial change in the condition in which they were sold.

84.    Plaintiffs and the class members are persons who would reasonably be expected to be affected by Defendants' products.

85.     Plaintiffs and the class members purchased, consumed, and exposed themselves to Defendants' products in a reasonably foreseeable manner.

86.    As a result of Defendants' actions, Plaintiffs and the class members purchased products that were completely without value, and Plaintiffs and the class members suffered economic harm.

87.    As a result of Defendants' actions, Plaintiffs and the class members also consumed and/or exposed themselves to poisonous, adulterated products and thereby suffered physical harm.

88.    Accordingly, Plaintiffs are entitled to collect from Defendants an amount to be determined by the enlightened conscience of an impartial jury.

## COUNT 6: ATTORNEYS' FEES

89.    Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs and other class members unnecessary trouble and

expense.

90.     Accordingly, Plaintiffs are entitled to collect from Defendants an amount to be determined by the enlightened conscience of an impartial jury.

## COUNT 7: PUNITIVE DAMAGES

91.     Defendants' conduct was willful, wanton, reckless, and evidences an entire want of care.

92.     As such, Defendants' conduct raises the presumption of a conscious indifference to the consequences of its actions.

93.     As a result of Defendants' willful, wanton, and reckless conduct, Plaintiffs and other class members are entitled to an award of punitive damages under O.C.G.A. § 51-12-5.1 and other applicable law.

## IV.   JURY DEMAND

94.     Plaintiffs demand a trial by jury for all claims.


## V.   DAMAGES AND PRAYER FOR RELIEF

95.     Plaintiffs pray for the following relief:

    a.     An order certifying this action as a class action, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as lead class counsel;

b.     All compensatory damages on all applicable claims in an

amount to be proven at trial and allowed by law; and

c.     All other and further relief that the Court deems appropriate and

just under the circumstances.

This 19th day of November 2021.

WETHERINGTON LAW FIRM, P.C.

*/s/ Matthew Q. Wetherington*
MATTHEW Q. WETHERINGTON
Georgia Bar No. 339639
ROBERT N. FRIEDMAN
Georgia Bar No. 945494
ELI J COHEN
Georgia Bar No. 862571

1800 Peachtree St. NW
Suite 370
Atlanta, GA 30309
Direct: (404) 888-3333
Main/Fax: (404) 888-4444
matt@wfirm.com
robert@wfirm.com
eli@wfirm.com